TWIN CITY TILE & MARBLE CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 8730.   Promulgated May 4, 1927.

Amounts paid stockholding officers and employees determined to be distributions of profits and not compensation for services.

*C. R. Fletcher, Esq.*, for the petitioner.
*D. D. Shepard, Esq.*, for the respondent.

This is a proceeding for the redetermination of deficiencies in income and profits taxes for the years 1919, 1920, and 1921 in the amounts of $1,238.81, $11,770.03, and $18,251.88, respectively. The portions of the deficiencies in controversy arise from the disallowance by the Commissioner in each year of certain amounts deducted by petitioner as salaries of officers and employees who were also stockholders.

### FINDINGS OF FACT.

In May, 1910, Frank Armstrong, Arne Verlo, and James Taylor associated themselves as a partnership under the name of the Twin City Tile & Marble Co., with its place of business at Minneapolis, Minn. Between May, 1910, and March, 1911, F. O. Streed, E. W. Streed, and H. B. Watson became members of the partnership. The business of the partnership consisted of procuring and performing contracts for the installation of tile and marble.

From time to time after the partnership was organized the various members contributed to its capital in varying amounts. The capital contributed by each member up to and including December 31, 1910, was as follows:

| | |
|---|---|
| James Taylor | $1,697.86 |
| Arne Verlo | 1,162.49 |
| Frank Armstrong | 816.30 |
| F. O. Streed | 1,114.98 |
| H. B. Watson | 386.48 |

In March, 1911 the petitioner was incorporated under the laws of Minnesota, and took over the business of the partnership. The corporation had its principal office in Minneapolis and has continued to procure and perform contracts for the installation of tile and marble work in residences and in public and other buildings where such work is required.

The original authorized capital stock of the corporation was $30,000, par value common stock and $20,000 par value 7 per cent preferred stock. In 1917 the authorized capital stock was increased from $50,000 to $100,000, divided into $70,000 par value common stock and $30,000, 7 per cent preferred stock. All of the stock was divided into shares having a par value of $100 each.

The members of the partnership became stockholders in the petitioner corporation and immediately after its organization stock was issued. The holdings of the various stockholders were increased so that the number of shares held by them was as follows on the dates indicated:

| | Taylor. | Verlo. | Armstrong. | F. O. Streed. | Watson. | E. W. Streed. | Hidding. | F. A. Streed. |
|---|---|---|---|---|---|---|---|---|
| Common stock holdings: | | | | | | | | |
| May 1, 1911 | 22 | 18 | 17 | 25 | 12 | 11 | 0 | 0 |
| Apr. 1, 1912 | 42 | 40 | 34 | 55 | 27 | 24 | 0 | 0 |
| Sept. 1, 1913 | 50 | 50 | 50 | 55 | 45 | 50 | 0 | 0 |
| Jan. 31, 1918 | 100 | 100 | 100 | 105 | 95 | 100 | 0 | 0 |
| Mar. 14, 1918 | 100 | 100 | 100 | 100 | 100 | 100 | 54 | 0 |
| Mar. 7, 1919 | 100 | 100 | 100 | 100 | 100 | 100 | 59 | 0 |
| May 1, 1919 | 137 | 100 | 100 | 121 | 0 | 106 | 79 | 16 |
| Jan. 1, 1920 | 137 | 100 | 100 | 121 | 0 | 106 | 85 | 16 |
| July 20, 1920 | 137 | 100 | 100 | 121 | 0 | 106 | 105 | 16 |
| Feb. 21, 1921 | 137 | 100 | 100 | 121 | 0 | 106 | 120 | 16 |
| Preferred stock holdings: | | | | | | | | |
| July 31, 1917 | 0 | 0 | 0 | 0 | 0 | 0 | 50 | 0 |
| Jan. 31, 1918 | 16 | 16 | 16 | 16 | 16 | 16 | 50 | 0 |
| Mar. 7, 1919 | 25 | 25 | 25 | 25 | 25 | 25 | 0 | 0 |
| Feb. 21, 1921 | 39 | 35 | 35 | 37 | 25 | 36 | 4 | 2 |
| July 5, 1921 | 52 | 45 | 45 | 49 | 25 | 46 | 16 | 3 |
| July 26, 1921 | 54 | 46 | 46 | 51 | 25 | 47 | 17 | 4 |
| Apr. 8, 1922 | 69 | 46 | 46 | 51 | 0 | 47 | 17 | 4 |

In 1917 T. G. Hidding, who formerly had been connected with the Alberene Stone Co., acquired stock in the petitioner corporation and subsequent to August 1, 1917, and throughout the years involved in this proceeding was a stockholder and an officer.

H. B. Watson severed his connection with the company in 1919, selling his common stock to the other stockholders and retaining his preferred stock until July 26, 1921.

Until 1915 the greater part of the business of the corporation was buying and installing tile. In 1915 petitioner purchased two marble-milling machines and began to do some of its own cutting and polishing of marble. In 1920 additional marble-milling machinery was installed.

The following statement shows for the years 1911 to 1921 the petitioner's net sales, amounts claimed by petitioner as salary paid officers and stockholding employees and profits, salaries of officers and employees having been considered in determining the profits:

| Year | Net sales. | Total salaries officer-stockholders. | Profits. |
|---|---|---|---|
| 1911 | $112,137.45 | $12,420.00 | $9,941.10 |
| 1912 | 170,817.55 | 12,600.00 | 13,520.10 |
| 1913 | 239,235.22 | 12,600.00 | 8,336.07 |
| 1914 | 221,443.38 | 12,720.00 | 13,657.34 |
| 1915 | 220,145.69 | 12,477.95 | 9,799.78 |
| 1916 | 218,522.60 | 12,708.50 | 13,506.40 |
| 1917 | 197,293.94 | 13,635.17 | 6,678.03 |
| 1918 | 260,498.47 | 20,644.72 | 6,374.08 |
| 1919 | 212,318.00 | 19,110.63 | 11,245.88 |
| 1920 | 346,368.60 | 44,156.94 | 21,342.26 |
| 1921 | 585,071.50 | 53,256.24 | 52,499.41 |

The following is a statement of the amounts paid by the petitioner corporation during the years 1911 through 1921 to its officers and such employees who were stockholders which it claimed to be compensation for services rendered:

| Year. | F. O. Streed. | Taylor. | Hidding. | Armstrong. | Verlo. | E. W. Streed | Watson. | F. A. Streed. |
|---|---|---|---|---|---|---|---|---|
| 1911 | $2,400.00 | $1,800.00 | | $1,800.00 | $1,800.00 | $1,800.00 | $1,800.00 | $1,020.00 |
| 1912 | 2,400.00 | 1,800.00 | | 1,800.00 | 1,800.00 | 1,800.00 | 1,800.00 | 1,200.00 |
| 1913 | 2,400.00 | 1,800.00 | | 1,800.00 | 1,800.00 | 1,800.00 | 1,800.00 | 1,200.00 |
| 1914 | 2,400.00 | 1,800.00 | | 1,800.00 | 1,800.00 | 1,800.00 | 1,800.00 | 1,320.00 |
| 1915 | 2,400.00 | 1,800.00 | | 1,667.55 | 1,618.45 | 1,781.95 | 1,800.00 | 1,410.00 |
| 1916 | 2,400.00 | 1,800.00 | | 1,832.40 | 1,653.05 | 1,723.05 | 1,800.00 | 1,500.00 |
| 1917 | 2,400.00 | 2,100.00 | $750.00 | 1,602.95 | 1,751.04 | 1,731.18 | 1,800.00 | 1,500.00 |
| 1918 | 3,300.00 | 3,000.00 | 2,286.00 | 2,560.00 | 2,666.66 | 2,631.18 | 2,700.00 | 1,500.00 |
| 1919 | 3,546.00 | 3,402.00 | 2,611.00 | 2,505.60 | 2.707.21 | 2,492.82 | | 1,846.00 |
| 1920 | 7,823.96 | 8,313.04 | 6,070.04 | 6,298.08 | 6,480.08 | 6,168.66 | | 3,003.08 |
| 1921 | 9,759.96 | 10,505.04 | 9,127.50 | 7,746.58 | 8,150.58 | 7,966.58 | | |

The petitioner in its returns for 1919, 1920, and 1921 deducted for compensation paid its officers and such employees as owned its stock the amounts shown below, whereas in an audit of the returns the respondent allowed only a portion of the amounts deducted. The following is a statement of the position held by each stockholder, the amounts deducted by the petitioner as compensation and the amounts allowed and disallowed by the respondent:

| | Amounts deducted by petitioner as compensation. | Amounts allowed by respondent as compensation. | Amounts disallowed by respondent. |
|---|---|---|---|
| **Year 1919:** | | | |
| F. O. Streed, president | $3,546.00 | $2,520.00 | $1,026.00 |
| James Taylor, vice president | 3,402.00 | 2,280.00 | 1,122.00 |
| T. G. Hidding, secretary-treasurer | 2,611.00 | 1,960.00 | 651.00 |
| F. A. Streed, draftsman | 1,846.00 | 1,750.00 | 96.00 |
| Frank Armstrong, superintendent | 2,505.60 | 1,605.60 | 900.00 |
| Arne Verlo, superintendent | 2,707.21 | 1,807.21 | 900.00 |
| E. W. Streed, superintendent | 2,492.82 | 1,556.82 | 936.00 |
| Total 1919 | 19,110.63 | 13,479.63 | 5,631.00 |
| **Year 1920:** | | | |
| F. O. Streed, president | 7,823.96 | 3,105.00 | 4,718.96 |
| James Taylor, vice-president | 8,313.04 | 2,970.00 | 5,343.04 |
| T. G. Hidding, secretary-treasurer | 6,070.04 | 2,565.00 | 3,505.04 |
| F. A. Streed, draftsman | 3,003.08 | 2,364.00 | 639.08 |
| Frank Armstrong, superintendent | 6,298.08 | 2,398.00 | 3,900.08 |
| Arne Verlo, superintendent | 6,480.08 | 2,580.00 | 3,900.08 |
| E. W. Streed, superintendent | 6,168.66 | 2,034.58 | 4,134.08 |
| Total 1920 | 44,156.94 | 18,016.58 | 26,140.36 |
| **Year 1921:** | | | |
| F. O. Streed, president | 9,759.96 | 3,105.00 | 6,654.96 |
| James Taylor, vice-president | 10,505.04 | 2,970.00 | 7,535.04 |
| T. G. Hidding, secretary-treasurer | 9,127.50 | 2,565.00 | 6,562.50 |
| Frank Armstrong, superintendent | 7,746.58 | 2,246.50 | 5,500.08 |
| Arne Verlo, superintendent | 8,150.58 | 2,650.50 | 5,500.08 |
| E. W. Streed, superintendent | 7,966.58 | 2,136.50 | 5,830.08 |
| Total 1921 | 53,256.24 | 15,673.50 | 37,582.74 |

The following resolutions were adopted by the directors of the petitioner corporation at meetings held on the dates indicated:

*August 14, 1918.* Motion made by Hidding and seconded by Watson that owing to high cost of living that all common stockholders have monthly salary increased equal to 9% per annum of common stock held by them to be divided into monthly payments dated back to January 1st, 1918.

*May 18, 1920.* Motion made by Taylor and seconded by Armstrong that due to continued increase in wages among working mechanics, common stockholders interested in corporation salaries be increased 8⅓ per cent dating from January 1st, 1920.

*September 6, 1920.* Motion made by Taylor and seconded by Armstrong that a salary bonus be paid from August 1st, 1920 to December 31st, 1920, paid monthly as follows to:

| | |
|---|---:|
| F. O. Streed | $484.00 |
| James Taylor | 548.00 |
| Arne Verlo | 400.00 |
| F. Armstrong | 400.00 |
| E. W. Streed | 424.00 |
| F. A. Streed | 65.00 |
| T. G. Hidding | 340.00 |

*November 14, 1921.* Motion made by Hidding and seconded by Taylor that a salary bonus be given

| | |
|---|---:|
| James Taylor | $4932.00 |
| F. O. Streed | 4356.00 |
| F. Armstrong | 3600.00 |
| A. Verlo | 3600.00 |
| E. W. Streed | 3816.00 |
| Art Streed | 576.00 |
| Hidding | 4320.00 |

The above increases and bonuses were in direct proportion to the holdings of stock of the parties named.

F. O. Streed was president of the company. In 1919 he was 59 years of age and had been engaged in the tile and marble business since 1885. Prior to his connection with the partnership, he had been connected with other companies in Minneapolis, engaged in the tile and marble business, and from 1892 to 1910 was president of the Northwestern Tile & Marble Co. of Minneapolis. From 1910 to 1919 his duties were to secure contracts for marble and tile, figure with Taylor on prices to submit on such work, help look after the financial matters of the company, including the borrowing of money and the endorsement of all notes at the bank. Beginning with 1919, Hidding took over part of the duties theretofore performed by F. O. Streed and thereafter Streed's activities consisted chiefly of figuring on bids and visiting and interviewing architects and contractors in connection with tile and marble work. He had a large acquaintance among the architects and contractors throughout the region and this assisted him in obtaining contracts. He continued to endorse all paper of the petitioner at the banks. Not considering contracts of $1,000 or less, Streed was instrumental in obtaining for the petitioner contracts as follows:

| Year | Number. | Amount |
|---|---:|---:|
| 1919 | 18 | $76,298.90 |
| 1920 | 33 | 168,030.40 |
| 1921 | 14 | 124,433.90 |

During 1919, 1920, and 1921 Streed devoted his entire time to the business of the petitioner, putting in extra time in the evenings.

In 1919 James Taylor, who was vice president of the petitioner corporation, was about 45 years of age and had been working in the tile and marble business since 1890.

Prior to coming to the partnership in 1910 he had worked with several tile and marble companies located in St. Paul, Minneapolis, and Milwaukee. At the time he became associated in the partnership with Verlo and Armstrong the parties agreed that he should do the office work, make estimates for the purpose of submitting bids for work, send out materials, and supervise all of the work from the office. The foregoing have continued to be the general nature of his work with the petitioner. He prepared and assisted in preparing estimates for bids to be submitted by the petitioner and assisted Hidding in purchasing all materials. One of his duties was to see that the necessary labor was employed to fulfill the contracts.

Since 1911, he has been a member of the arbitration board for adjusting disputes between employers and employees engaged in tile and marble work. This gave him such an acquaintance with the labor situation as enabled him at all times to keep the petitioner supplied with the necessary labor. During the years involved in this proceeding Taylor devoted his entire time to the business, putting in a great deal of overtime. He endorsed all paper of the petitioner for loans at the various banks and at times his liability thereon was as high as $40,000. In addition to his other services, he was instrumental in procuring contracts for the petitioner totaling $17,030.85 in 1919, $47,696 in 1920, and $3,260 in 1921, not including contracts of less than $1,000.

T. G. Hidding was secretary-treasurer. For about ten years prior to 1917, he was connected with the Alberene Stone Co. of New York, which was a quarrier and producer of soapstone. About six years of the time that he was employed by that company, he was engaged in selling its products to jobbers and marble mills, and installing them in laboratories of universities and other institutions of learning. These duties took him over a large number of the States. When he became connected with petitioner corporation about August 1, 1917, he brought to the business the agency for the products of the Alberene Stone Co., and since has continued to act as its agent. This connection has been profitable to the petitioner. During the years 1917 and 1918 Hidding's duties consisted of keeping petitioner's books, supervising the sale of the products of the Alberene Stone Co. and acquainting himself with the tile and marble business. During 1919 he became secretary of the petitioner corporation, and his duties then consisted of estimating for tile and

marble work, securing contracts, keeping the books, assisting Taylor in purchasing materials, looking after the finances of the company and with F. O. Streed and Taylor endorsing all the paper of the company at the banks. At times his liability on such paper was as high as $40,000. Not considering contracts of $1,000 or less, Hidding was instrumental in obtaining for the petitioner contracts as follows:

| Year. | Number. | Amount. |
|-------|---------|---------|
| 1919 | 6 | $21,496.50 |
| 1920 | 7 | 21,660.40 |
| 1921 | 7 | 165,048.40 |

During the years 1919, 1920, and 1921 he devoted his entire time to the business of the petitioner. During 1920 and 1921 he put in extra time, doing practically all of the bookkeeping for the company after office hours and taking no vacations in those years. Petitioner procured between 35 per cent and 40 per cent of the contracts upon which Taylor, F. O. Streed and Hidding figured.

Frank Armstrong was 44 years of age in 1919. Prior to joining the partnership in 1901 he had had ten years' experience in the tile and marble business. His duties with the petitioner have been acting as superintendent of construction. His work in that capacity consisted of the supervision of work being installed, checking all material as it arrived on the job, seeing that the proper material was delivered to the men and that it was properly installed according to the specifications. He reported to Taylor as general superintendent, but was responsible for the successful completion of the particular job he was supervising. He made weekly reports of the progress of the work and kept and reported the time of the men working under him, who at times numbered as high as thirty. On the larger jobs his entire time was engaged in performing his duties as superintendent, whereas on the smaller jobs he spent about half of his time in working with the men. On some of the larger jobs Verlo assisted in supervision of construction, being in charge of the tile work, while Armstrong was in charge of the marblework. All work installed was supervised by either Armstrong, Verlo, or E. W. Streed. During 1919, 1920, and 1921 Armstrong supervised alone construction of work totaling $146,082.65, and in association with Verlo totaling $35,605, not including contracts amounting to less than $1,000. Armstrong during these years devoted his entire time to the business, as well as putting in overtime.

Verlo in 1919 was 35 years of age and prior to becoming a member of the partnership in 1910 was employed in the tile and marble business. His duties with the petitioner were similar to those of Armstrong and at times he had as many as sixty men working under

his supervision. During 1919, 1920, and 1921 he supervised alone the construction of work totaling $171,325.60, and in association with E. W. Streed totaling $16,500, not considering any contracts amounting to less than $1,000. He devoted his entire time to the business, putting in much overtime.

E. W. Streed was about 45 years of age in 1919 and prior to coming into the partnership in 1910 had been engaged in the tile and marble business. He is a brother of F. O. Streed, the president of the petitioner corporation. His duties with the petitioner were similar to those of Armstrong and Verlo, except that his work was more particularly connected with residences and smaller jobs. During 1919, 1920, and 1921, he supervised alone the construction of work totaling $22,343.85, not considering contracts amounting to less than $1,000. He devoted his entire time to the business.

F. A. Streed was about 30 years of age in 1919, and is the son of F. O. Streed. He has been employed by the petitioner since 1911. His principal work was that of draftsman, in the course of which he drew up from the general plans the plans and specifications for the marble and tile work for submission to architects and contractors, and also got out schedules of the various sizes of all the material that went into the various jobs. He had an assistant in this work. He did some estimating and also procured some contracts. He devoted his entire time to the business.

During 1919, 1920, and 1921 the petitioner did work in North Dakota, South Dakota, Wisconsin, Illinois, and Iowa, as well as in Minnesota.

### OPINION.

TRAMMELL: The respondent has disallowed as deductions in computing the net income of the petitioner for the years 1919, 1920, and 1921 the amounts of $5,631, $26,140.36, and $37,582.74, respectively, being portions of the amounts deducted as salaries for officers and employees who were stockholders of the petitioner corporation. The disallowance is based on the ground that the amounts disallowed were not in fact reasonable compensation for personal services actually rendered but constituted distributions of profits.

Section 234 (a) (1) of the Revenue Acts of 1918 and 1921 provides that in computing the net income of corporations subject to tax there shall be allowed as a deduction " all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered  *  *  *."

The petitioner does not deny that the increase and bonuses paid to its officers and stock-owning employees were in direct proportion to

their stock ownership, but contends that the amounts authorized and paid were reasonable for the services rendered when the ability, experience, responsibility, duties, and services of such officers and employees and their worth to the business is considered.

The amounts paid to the officers and stockholding employees and deducted as compensation for the years involved bear approximately the following percentages to the amounts paid for 1917:

|  | 1919. | 1920. | 1921. |
|---|---|---|---|
|  | Per cent. | Per cent. | Per cent. |
| F. O. Streed | 147 | 325 | 406 |
| Taylor | 162 | 395 | 500 |
| Hidding | 145 | 337 | 507 |
| Armstrong | 156 | 393 | 483 |
| Verlo | 154 | 370 | 465 |
| E. W. Streed | 144 | 356 | 460 |
| F. A. Streed | 123 | 200 |  |

The first question to determine is whether the amounts which were disallowed by the respondent as compensation to officers and stockholding employees were paid by the corporation as compensation for services rendered. If the amounts were in fact distributions of profits as determined by the respondent, they would not be allowed as deductions in determining the petitioner's net income. It may be that if the amounts had been paid as compensation, they would have been allowed as being reasonable. In determining whether the amounts were compensation for services or were distributions of profits, all the facts and circumstances must be considered and not merely the fact that the amounts were reasonable.

In this case, we find that the amounts which the petitioner claimed as additional compensation for services rendered were paid to the stockholders of the corporation in the exact proportion to their stockholdings. The payments of the amounts were authorized by resolutions of August 14, 1918, May 18, 1920, September 6, 1920, and November 14, 1921. The resolution of August 14, 1918, authorized a monthly salary increase to the stockholders equal to 9 per cent of the common stock held by them dated back to January 1, 1918. The resolution of May 18, 1920, was substantially the same except that the increase was to be based on 8⅓ per cent of the stock ownership on January 1, 1920. The other resolutions, while not prescribing that the increase shall be based specifically on stock ownership, actually used that as a basis in determining the amounts to be paid. In other words, the amount of stock owned by each stockholder seems to have been the sole criterion or measure of the additional amounts to be paid him. The increases allowed were not based on the amount of compensation which each officer was receiving at the time.

The value of services of an individual is not dependent upon the amount of stock owned. The value of services and the amount of

stock owned have no necessary relationship to each other. The meas-. ure used in determining the increases in this case was stock ownership, regardless of the fact that certain stockholders may have been entitled to a greater or lesser amount if the value of their services were solely considered. In order to be compensation for services, the value of the services must measure the amount and not stock ownership. Conceding for the sake of argument that the services of individuals in this case were fairly worth the amounts they received, this fact alone is not sufficient to constitute the amounts compensation. They must have been intended and paid as such.

In the *Appeal of Woodcliff Silk Mills*, 1 B. T. A. 715, we said:

> The fact that salaries paid to its officers by a corporation are in direct proportion to the stockholdings of the respective officers is strong evidence of an intent to distribute profits as salaries and must be overcome by clear evidence showing that the salaries are reasonable in amount and actually represent compensation for personal services rendered.

We are of the opinion after a consideration of all of the evidence that the petitioner has not shown that the amounts which were disallowed by the respondent were in fact compensation for services rendered and not distributions of profits.

*Judgment will be entered on 15 days' notice, under Rule 50.*