Donald V. Smith v. Commissioner. Zephyr Mills, Inc. v. Commissioner. Jones County Hosiery Mills, Inc. v. Commissioner. Ellisville Hosiery Mills, Inc. v. Commissioner.
Smith v. Commissioner
Docket Nos. 5836, 5837, 5838, 5839.
United States Tax Court
1947 Tax Ct. Memo LEXIS 204; 6 T.C.M. (CCH) 548; T.C.M. (RIA) 47137; May 21, 1947
*204 Docket No. 5836 1. Petitioner, an individual, personally endorsed the notes of his company. The notes were in payment for certain machinery. After the company went into bankruptcy petitioner as endorser, and the vendor of the machines entered into a settlement agreement. Pursuant to this agreement petitioner made certain monthly payments to the vendor in settlement of his endorser's liability. Held, that petitioner has failed to establish the necessary elements to permit a deduction of the amounts so paid. 2. Petitioner was indebted to a bank on account of certain personal loans and on account of his having endorsed certain commercial paper discounted by the bank for the benefit of petitioner's companies. In settlement of this indebtedness petitioner relinquished ownership in the collateral security to the bank. Held, petitioner has failed to prove the elements necessary to permit a deduction on account of the settlement. 3. The trustees in the bankruptcy of petitioner's company instituted two suits against petitioner in the state court. One suit was to recover $25,000 claimed to have been wrongfully converted by petitioner. The other suit was to recover $37,110 from petitioner for *205 dividends claimed to have been declared while he was a director. Both suits were settled by a compromise arrangement under which petitioner paid $2,500. Held, only so much of $2,500 as is properly allocable to the settlement of the $37,110 claim is deductible by petitioner. 4. Petitioner paid his attorney certain fees for legal services in connection with the above transactions and in connection with certain personal matters, the nature and extent of which are undisclosed. Held, petitioner has failed to prove the necessary elements to permit any deduction on account of the fees paid. Docket No. 5837 5. Petitioner, a corporation, paid certain amounts to one of its officers and shareholders, which amounts were equivalent to 5 cents on every dozen pairs of hose sold to X Company. The recipient officer had had nothing to do with obtaining X's business or retaining it. Petitioner's business with X represented almost its entire source of income. Held, petitioner failed to prove the amounts paid were reasonable compensation and they are not therefore deductible. Held, further, amounts paid to a salesman measured by sales actually made are deductible. Docket No. 5838 6. Amount of loss on scrapped *206 machinery determined. 7. Held, petitioner failed to prove that certain amounts paid by it to its officers were in fact payment for services actually rendered and petitioner is therefore not entitled to deduct such amounts. 8. Allowable amount for traveling expenses determined. 9. Petitioner held subject to penalty for failure to file certain returns within the time prescribed by law. Docket No. 5839 10. Reasonable compensation determined. 11. Depreciation rate allowed by Commissioner sustained. 12. Legal fees paid by petitioner for legal services necessary to its business, held, deductible business expenses. 13. Petitioner held subject to penalty for failure to file an excess profits tax return. Joseph J. Brown, Esq., 1535 Land Title Bldg., Philadelphia, Pa., and D. Alexander Wieland, Esq., for the petitioners. William H. Best, Jr., Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: These four cases were consolidated for trial and have been submitted on oral testimony and exhibits. The issues involved and other introductory information are set forth hereinafter for convenience under their appropriate docket headings. DONALD V. SMITH, Docket No. 5836 *207 Respondent determined deficiencies in petitioner's income tax liability for the taxable years 1940 and 1941 in the respective amounts of $674.41 and $543.43. The questions involved are (1) whether amounts paid by petitioner in settlement of his liability as endorser on certain notes are deductible, (2) whether the value of collateral which petitioner transferred to his debtor in settlement of various indebtednesses is deductible, (3) whether amounts paid by petitioner in settlement of certain suits instituted against him by trustees in bankruptcy of petitioner's company are deductible by petitioner, and (4) whether certain legal fees paid by petitioner in connection with certain of the above transactions are deductible by him as business expenses. Petitioner filed his returns with the collector of internal revenue for the first district of Pennsylvania at Philadelphia. The returns are on a calendar year and cash basis. Issue 1. - Finkbeiner Notes Findings of Fact During the taxable years petitioner was treasurer and majority stockholder of Vertex Hosiery Mills, Inc., hereinafter referred to as Vertex. Petitioner owned 2,095 of 3,395 outstanding shares of stock of Vertex. The remaining *208 shares had been placed in trust by petitioner for the benefit of his wife and children. Petitioner exercised full control over the operation and management of Vertex. Vertex was engaged in the business of manufacturing full fashioned hosiery. In the fall of 1937 Vertex purchased a certain number of full fashioned hosiery machines from Walter J. Finkbeiner on an installment basis. Vertex wanted to acquire full title to the machinery at the time of purchase because it intended to lease such machines to other parties for a 25-year term. Finkbeiner was unwilling to surrender full title under the installment arrangement unless petitioner endorsed the serial notes which Vertex was to deliver to him in payment. Petitioner agreed to endorse such notes because he thought the arrangement was advantageous to Vertex. Twenty notes, each in the principal amount of $750, were executed by Vertex payable to Finkbeiner and endorsed by petitioner. On March 8, 1938, Vertex filed a petition in bankruptcy under the provisions of section 77-B of the National Bankruptcy Act in the United States District Court for the Eastern District of Pennsylvania. In the latter part of 1939 petitioner and Finkbeiner entered *209 into an agreement with respect to the notes in question. Petitioner was represented by Joseph J. Brown and Finkbeiner was represented by T. Fred Woodley. On October 30, 1939, Brown wrote Woodley a letter, the pertinent provisions of which are as follows: "Referring to our conversation of this morning, I understand that the matter referred to in my letter of the 27th instant will be handled as follows: - "Smith will execute and deliver to Walter J. Finkbeiner a promissory note for $7,500.00 in the form enclosed herewith. This note-will be given by Smith and accepted by Finkbeiner in full satisfaction of any and all liability of Smith in connection with all of the outstanding Vertex notes endorsed by Smith and now held either by Finkbeiner or the latter's bank. I understand that these notes are twenty in number, each in the amount of $750.00. These Vertex notes are to be held by you in escrow as collateral security for payment of the $7,500.00 note which is also to be held by you, and all of these notes will be surrendered to Smith for cancellation upon payment of the $7,500.00 note. "Payments are to be made as follows: - $500.00 on or before November 6th and not less than $100.00 on *210 the first day of each month commencing January 1, 1940. All payments shall be made to you as attorney for Mr. Finkbeiner and shall be receipted for by you upon the $7,500.00 note. "Upon your approval of the foregoing, I will ask Mr. Smith to execute and forward the $7,500.00 note in question together with the first payment of $500.00." On October 31, 1939, Woodley wrote Brown in part as follows: "I have your letter of yesterday, but it did not contain a form of promissory note which you stated you were enclosing therewith. "You state, I think, the agreement of our clients clearly and precisely except that you do not include the additional consideration moving from Smith to Finkbeiner, namely, any dividends in the Vertex bankruptcy which might be forthcoming on the $7500.00 of notes which are part of the notes Mr. Smith is clearing. That, of course, is a part of the understanding and with that included I think everything is in shape. I will hold all the notes as you request in your letter and note each payment on the back of the $7500.00 note." On November 1, 1939, Brown wrote the following letter to Woodley: "Referring to yours of the 31st ultimo, it is understood that Mr. Finkbeiner *211 will be entitled to retain any dividends received by him in the Vertex bankruptcy, without crediting the same against the note to be given by Mr. Smith in the amount of $7,500.00. "I have in my possession Mr. Smith's note in the amount of $7,500.00, a copy of which is enclosed herewith. I will forward the original to you when I receive from Mr. Smith the check in the amount of $500.00 which is likewise to be forwarded to you." On November 3, 1939, Brown wrote Woodley a letter in part as follows: "In accordance with the agreement set forth in our recent correspondence, I enclose herewith promissory note dated October 31, 1939, drawn by Donald V. Smith to the order of Walter J. Finkbeiner in the amount of $7,500.000. I also enclose cashier's check No. 9499 drawn by The First National Bank of Coopersburg, Pa. to your order as attorney in the amount of $500.00." Pursuant to this letter agreement petitioner paid Finkbeiner by cashier's checks $100 a month during 1940 and 1941. Petitioner, on his returns for 1940 and 1941, claimed a deduction of $1,200 on account of such payments. The amounts so claimed in both years were included under the item on the return entitled "Other Deductions Authorized *212 by Law." Respondent disallowed the claimed deduction of $1,200 for each of the years 1940 and 1941. In the explanation accompanying the notice of deficiency, respondent stated in part: "(a) The deduction claimed * * * on notes * * * has been disallowed. The evidence submitted does not prove that these items are deductible for income tax purposes." Opinion Petitioner contends that the amounts paid by him to Finkbeiner on account of his endorsements of the notes are deductible as a business loss or a worthless debt. Respondent contends that petitioner is not entitled to any deduction. We think respondent must be sustained. We do not think the amounts in question can be deducted as a business loss because, in our opinion, the endorsements of the Finkbeiner notes can not properly be considered as constituting part of petitioner's trade or business. To consider petitioner's endorsement of the notes otherwise would, in our opinion, be to disregard improperly Vertex's corporate entity. Burnet v. Clark, 287 U.S. 410; Dalton v. Bowers, 287 U.S. 404. Nor do we think the amount in question can properly be deducted as a worthless debt. Assuming that petitioner became subrogated to Finkbeiner's *213 rights against Vertex and thus became Vertex's creditor, there is a singular lack of evidence in the record bearing on petitioner's exercise of his creditor rights or Vertex's ability to fulfill its liabilities in this respect. We are not told whether petitioner or Finkbeiner made any efforts to obtain any dividends in liquidation from Vertex. We are not told what relative priority, if any, Vertex's debt to Finkbeiner or petitioner held as compared with other of Vertex's debts. Similarly, there is no evidence which permits us to estimate to what extent, if any, Vertex might have been able to satisfy its obligation to petitioner or Finkbeiner through liquidating dividends or otherwise. We do know that Vertex was undergoing bankruptcy proceedings but we are offered nothing in terms of Vertex's assets or liabilities or, in other words, the degree of its insolvency. To permit a worthless debt deduction as claimed by petitioner would require us to assume that appropriate efforts were made to recover against Vertex and that Vertex was totally unable to respond. Since the record is silent with respect to these matters we would not be justified in making such assumptions. We therefore approve *214 respondent's disallowance of the deductions of $1,200 in each of the years 1940 and 1941 by virtue of his payments to Finkbeiner. Although not argued by petitioner on brief we have considered and dismissed the possibility of the amounts paid by petitioner to Finkbeiner being a loss incurred in a transaction entered into for profit under section 23 (e)(2). Losses arising from the guaranty of a company's obligation have been allowed under section 23 (e)(2) where the taxpayer concerned entered the guaranty transaction for profit in terms of increasing the value of the stock held by such taxpayer in the company accommodated. Such was the case in Marjorie Fleming Lloyd-Smith, 40 B.T.A. 214, affirmed on other grounds, 116 Fed. (2d) 642, cert. denied 313 U.S. 588. That the guaranty transaction was entered into for that or any other purpose of profit in the instant case does not appear from the evidence. We know that petitioner entered into the endorsement transaction to enable Vertex to acquire title to the machines and that petitioner considered such acquisition "advantageous" to Vertex. We also know that Vertex proposed leasing these machines to the Jones County Agricultural High School *215 and Junior College in Mississippi where Vertex was operating a vocational school. The terms or considerations for, or the financial or otherwise economic advantages, if any, from such proposed lease are not disclosed. There is no evidence of what, if any, profit, direct or indirect, petitioner expected or hoped to realize from the proposed lease of the machines. We know, as later appears in Docket No. 5838, that Jones County Hosiery Mills, Inc., another of petitioner Smith's corporations, conducted a similar operation in connection with the Junior College commencing in 1938. The machines used by Jones County Mills were acquired by it from Vertex's trustees in bankruptcy in 1938. Vertex went into voluntary bankruptcy in March 1938, having acquired the machines some few months prior thereto. It was incumbent upon petitioner to establish that the endorsement transaction was in fact entered into for profit in order to qualify for a loss deduction under section 23 (e)(2). This petitioner has not done. We decline to apply section 23 (e)(2) here not because petitioner has not shown that the profits expected from the transaction were immediate or direct but because he failed to establish that *216 any profits at all were expected or intended to result from such transaction. Issue II. - Markle Banking & Trust Company Settlement Findings of Fact When Vertex filed its petition in bankruptcy in March 1938 petitioner was obligated to Markle Banking & Trust Company of Hazleton, Pa., hereinafter referred to as Markle, on his personal indebtedness and as endorser in the approximate total amount of $300,000. This indebtedness was approximately constituted as follows: (a) $70,000 represented loans to petitioner for which he had given his personal notes. (b) $50,000 represented petitioner's liability as endorser on trade acceptances and other commercial paper which the Hazleton Silk Company, one of petitioner's companies, had had discounted by Markle. (c) $180,000 represented petitioner's liability as endorser on trade acceptances and commercial paper which Vertex had had discounted by Markle. Markle required petitioner's endorsement on the Hazleton and Vertex paper before discounting it. Petitioner made the $70,000 borrowed from Markle on his personal notes available to Vertex and Hazleton. Petitioner owned 60 per cent of Hazleton stock and was its managing officer. Vertex and Hazleton, *217 due to expanding sales, required the moneys in question in their operations. Petitioner, to secure such indebtedness to Markle, had from time to time furnished certain property owned by him as collateral. In December 1940 the total of the above indebtedness to Markle had been reduced to $242,000. Markle claimed that this amount exceeded the value of petitioner's collateral by $125,000 to $150,000. Petitioner, by his attorney Brown, negotiated a settlement agreement with Markle with respect to this indebtedness. On December 6, 1940, petitioner and Markle executed an agreement by which petitioner transferred absolute title to the collateral to Markle and Markle released petitioner from all further liability on account of the indebtedness. Such collateral when thus transferred was worth $92,000. Petitioner received no reimbursement from Vertex or Hazleton on account of such settlement. Petitioner, by an amended petition, claimed a deduction of $200,000 on account of the settlement agreement with Markle. On brief, however, petitioner now claims as a deduction the amount of $117,000 or $92,000, which he claims was the value of the collateral surrendered in the settlement. These alternate *218 amounts represent the difference between the above described indebtedness to Markle in December 1940 of $242,000 and either $125,000 or $150,000 by which the indebtedness was claimed to have exceeded the value of the collateral. Opinion Petitioner contends that the value of the collateral which he transferred to Markle constituted by subrogation a debt in his favor from Vertex and Hazleton which became immediately worthless. Respondent contends that petitioner has failed to prove the necessary elements to permit a worthless debt deduction. We agree with respondent. In our opinion there is a lack of evidence to show that a creditor-debtor relationship was created between petitioner and Vertex and Hazleton as a result of his settlement with Markle. But assuming such relationship was so created, there is no evidence as to whether the debt of either Vertex or Hazleton was worthless either wholly or in part. Vertex was in bankruptcy under section 77-B of the Bankruptcy Act but there is no evidence as to the assets of Vertex or the amount of its debts. Also as to Hazleton there is no evidence as to its financial condition or its ability to reimburse petitioner. The $70,000 which petitioner *219 borrowed from Markle on his personal notes was made available to Hazleton and Vertex but there is no evidence as to the terms or conditions upon which such money was so made available. The record shows that the $70,000 loan was petitioner's personal obligation to Markle and there is no evidence to show that either Vertex or Hazleton assumed an obligation to repay the loan to Markle or to reimburse petitioner for the money from the loan which he made available to them. Moreover, there is no evidence that petitioner made any effort, or that he was unable, to collect from Vertex or Hazleton any part of the items above described. There is, therefore, a failure of proof to show that petitioner is entitled to the claimed deductions as a bad debt. Nor can we find evidence to support a deduction of this item as a business loss, assuming there was a loss. There is no evidence that the moneys borrowed from Markle were obtained or used for carrying on a trade or business of petitioner. Obviously, the businesses in which the moneys were used were those of Vertex and Hazleton. The question of whether the item is deductible as a loss sustained in a transaction for profit, though not connected with *220 a trade or business, must be decided adversely to petitioner for lack of sufficient evidence to establish that the loss, if any, was sustained in such a transaction. The evidence discloses that Vertex was a corporation whose stock was wholly owned by petitioner and members of his family and that petitioner owned 60 per cent of the stock of Hazleton. Also it is in evidence that petitioner was not reimbursed for any part of the claimed loss. It is true that Vertex was in voluntary bankruptcy in 1938 but there is no showing as to whether or not either Vertex or Hazleton had assets which might have been available for such reimbursement in whole or in part. Because of the lack of such evidence we have held the item was not deductible as a bad debt. The lack of such evidence also leaves a fatal hiatus in the proof necessary to establish (1) whether petitioner sustained the loss claimed and, if so, (2) whether it was sustained in a transaction entered into for profit. Petitioner controlled both corporations and their corporate entities for tax purposes are not in question. It is not contended that the claimed loss was that of a capital contribution and there is no showing that it was such. *221 The claimed loss can not be held to be an operating loss or an expense of business carried on by petitioner. Accordingly we hold that it is not shown that the item in question is deductible under section 23 (e)(2), Internal Revenue Code. For failure of proof to establish otherwise, we approve respondent's disallowance of the deduction of the item here in question. Issue III. - Settlement of Trustees' Suit Findings of Fact The trustees in bankruptcy of Vertex filed certain suits against petitioner and others in the Court of Common Pleas of Philadelphia County during the December 1939 term. One such suit was against petitioner alone in trespass seeking to recover $25,000. The trustees alleged in this suit that petitioner had converted to his own use the amount of $25,000 which properly belonged to Vertex. The question involved was whether a note made out to petitioner by Ajax Hosiery Mills, a selling agent of Vertex, was executed in payment of an indebtedness owing from Ajax to petitioner or owing to Vertex. Another suit was brought by the trustees in assumpsit for $37,110 against petitioner, petitioner's wife and brother as directors of Vertex for dividends paid on June 28 and December *222 31, 1937. The trustees alleged that these dividends were paid at a time when Vertex was known by petitioner to be insolvent. The trustees also filed a bill in equity against Markle to recover $11,960 which Markle had received as trustee for the wife and children of petitioner in the form of dividends above mentioned. The amount of $11,960 was a part of the $37,110 for which the trustees were suiting petitioner as director of Vertex. Petitioner and Markle offered to settle these suits with the trustees for $10,000. The trustees requested the approval of the bankruptcy court to accept this proposal. On March 31, 1941, the Special Master recommended that the proposed settlement be accepted. The Special Master reported that although he considered the suits instituted by the trustees against petitioner and Markle as essentially meritorious he recommended the proposed settlement on the ground that it would be impossible to successfully satisfy any judgment against Smith. In this connection the Special Master stated: "* * * Even if Smith did not go into bankruptcy, in order to be discharged from his obligations, it is obvious that it is difficult to make collection out of a debtor who is *223 as deft in evasion of his obligations as is Smith. He has no bank account, although his wife has one; money from his salary he carries in his pocket, unless he conceals it. The conclusion to which the Special Master therefore arrives is that, even if the trustees were successful in the aforementioned suits, the prospect of a collection out of Smith of such judgment is substantially nil." The bankruptcy court approved the proposed settlement on April 11, 1941. Of the $10,000 paid in settlement, $2,500 was paid by petitioner on April 14, 1941, the remainder being paid by Markle. Petitioner claims the amount of $2,500 as a deduction for 1941 as a loss sustained in carrying on business. The deduction was disallowed by the respondent. Petitioner's obligation, if any, in respect of the claimed liability of $25,000 in the suit in trespass did not arise out of his trade or business. His obligation, if any, in respect of the claimed liability of $37,110 in the suit in assumpsit arose out of his business activity. It is practicable and reasonable to allocate the compromise payment of $2,500 between the $25,000 claimed in the suit in trespass and the $37,110 claimed in the suit in assumpsit *224 in the proportions which each of the claimed amounts bears to the total of such amounts. Opinion Respondent argues that the amount of $2,500 which petitioner paid the trustees in bankruptcy in settlement of the suits is not deductible as a business loss or expense. Respondent argues that this amount paid by petitioner did not arise from his trade or business and further that it was in the nature of a refund and consequently can not be considered as a loss or expense. The suit against petitioner for $25,000 arising out of his alleged conversion of funds owing from Ajax to Vertex appears to us not to have arisen from petitioner's trade or business. The liability assertedly arose, if at all, not as a result of any official capacity petitioner held with either corporation but was one personal in nature. But we think the liability asserted against petitioner as director of Vertex for declaring dividends when Vertex was insolvent was one arising from petitioner's business activity. We have found that the $2,500 payment in question is allocable between the amounts claimed respectively in the two suits hereinabove described in the proportions set forth in our findings of fact. Accordingly, *225 we hold of the $2,500 in question 37110/62110 thereof is deductible and the remainder thereof is not deductible. Issue IV - Legal Fees Findings of Fact Petitioner paid his attorney Brown $1,300 in 1940 and $620 in 1941 as legal fees. The services for which these fees were paid included Brown's activity in connection with the Finkbeiner notes, the Markle settlement, the setlement of the suits brought against petitioner by the trustees in bankruptcy and other miscellaneous matters. There is no itemized record which shows how much of the amounts paid by petitioner to Brown in 1940 and 1941 are allocable to any specific services rendered by Brown. Petitioner on his return for 1940 claimed a deduction of $2,700 as legal fees paid to Brown and claimed a $700 deduction on his return for 1941 also as fees paid to Brown. Petitioner now concedes that these amounts are excessive and now claims a deduction of $1,300 in 1940 and $620 for 1941 as deductions for legal fees paid to Brown. Opinion Respondent contends that the legal fees paid by petitioner to his attorney Brown are not deductible as business expenses or losses because they did not arise from petitioner's trade or business. Respondent *226 further contends that the evidence does not adequately substantiate the claimed deductions. From the previous discussions it is apparent that petitioner's activities with respect to the Finkbeiner notes and the Markle and trustees' suit settlements can not be considered as constituting a part of petitioner's trade or business with the possible exception of the settlement of the trustees' suit in so far as such settlement may have related to the liability asserted against petitioner as director of Vertex for improperly declaring dividends. Petitioner has not established that any of the mentioned activities constitute transactions entered into for profit. But even assuming that some of the above activities might be considered of such character as to permit a deduction for legal expenses in connection therewith, there is no evidence as to what portion of such legal fees are properly or even approximately attributable to activities having such a character. It also appears from the record that the legal fees in question in addition to pertaining to the above mentioned matters also related to other miscellaneous personal matters, the nature and extent of which are not presented to us. Here *227 again the record fails to afford us a basis for determining what part of such fees is properly allocable to items which would permit a deduction. On this state of the proof we are even unable to approximate an estimate of the amount which might be considered properly deductible, if any. For lack of evidence, therefore, we approve respondent's disallowance of the legal fees in question as a deduction to petitioner. ZEPHYR MILLS, INC., Docket No. 5837 Respondent determined deficiencies in petitioner's income and declared value excess profits taxes for the taxable years ending June 30, 1940, 1941 and 1942 as follows: 1940
1941
1942
Income Tax
$801.64
$615.89
$1,596.10
Declared Value Excess-
Profits Tax
440.62
931.36
The question is whether certain deductions claimed by petitioner as business expenses in the form of commissions are allowable. The determination of this question will determine the propriety of the declared value excess profits tax deficiency as well as the income tax deficiency. Petitioner filed its returns with the collector of internal revenue for the first district of Pennsylvania at Philadelphia. Petitioner's fiscal year ends June 30 and it is on an accrual basis of accounting. *228 Findings of Fact Petitioner, a Pennsylvania corporation, was organized in July 1939 with principal offices in Coopersburg, Pennsylvania. Petitioner is engaged in the full fashioned hosiery business. During the taxable years Donald V. Smith, the petitioner in Docket No. 5836, was president of petitioner and in control of its management. Edwin J. Doerr was petitioner's secretary and treasurer and assisted Smith in its management. Smith, Smith's wife and Doerr were petitioner's directors. From the time of its organization and during the taxable years petitioner had outstanding 100 shares of common no par value stock. Helen H. Smith, Donald V. Smith's wife, owned 75 of these shares for which she had paid $375 to petitioner at its organization. The remaining 25 shares were owned by Doerr for which he had paid petitioner $125. In the early summer of 1939 Smith, by his own exclusive efforts and contacts, had obtained the opportunity of selling hosiery to A. S. Beck & Co., a large retail shoe and hosiery concern, having stores in New York City, Philadelphia and other cities. A. S. Beck & Co. requested Smith to establish some form of business organization through which he would deal with Beck. *229 Smith made use of departments of existing corporations and other temporary devices until petitioner was organized. After petitioner was organized it succeeded to the A. S. Beck account, which account constituted practically all of petitioner's business during the taxable years ending June 30, 1940 and 1941. Doerr, as secretary and treasurer, received a salary of $75 a week or $3,900 annually. Smith, as president of petitioner, received an annual salary of $11,700. Neither Smith nor Doerr devoted his full time to petitioner's business. Doer became dissatisfied with the compensation he was receiving from petitioner. He was interested in going into business for himself. Smith wished to retain Doerr's services and thought that if Doerr went into business for himself it might lead to conflict between them. An oral agreement was entered into between Smith, acting for petitioner, and Doerr under which Doerr, in addition to his regular salary, was to receive an amount equivalent to 5 cents on every dozen pairs of hose sold to A. S. Beck. Smith adopted this formula not as a measure of Doerr's services or as a stimulus to Doerr's incentive but in order to gear such payments to petitioner's ability *230 to pay. This arrangement was not formally approved by the directors and terminated in the summer of 1941 when petitioner's dealings with A. S. Beck terminated. During 1940 Smith doubted petitioner's ability to retain the A. S. Beck business. He therefore considered it desirable that petitioner's markets in New York be extended and diversified. With this in mind Smith hired S. F. McNell as petitioner's sales representative in New York. McNell was to receive 3 per cent of any sales made by him for petitioner. During the taxable years here involved 3 per cent was in general the minimum sales' commission paid by the full fashioned hosiery industry. McNell received from petitioner in commissions under this arrangement $1,720.32 for the fiscal year ending June 30, 1941, and $6,603.14 for the fiscal year ending June 30, 1942. On its income tax return for the fiscal year ending June 30, 1940, petitioner reported as gross income $47,654.01 and claimed deductions in the amount of $48,844.92, showing a loss of $1,190.91. In its return for the fiscal year ending June 30, 1941, petitioner reported a gross income of $45,143.12 and claimed deductions in the amount of $46,667.06, showing a loss of *231 $1,523.94. On its return for the fiscal year ending June 30, 1942, petitioner reported gross income of $48,437.87 and claimed deductions of $48,808.39, showing a loss of $370.52. On Schedule M of its return for the fiscal year ending June 30, 1940, petitioner claimed a deduction of $11,084.60 for commissions paid, of which amount $7,834.83 is claimed in the petition to have beee paid to Doerr. In Schedule K of petitioner's return for the fiscal year ending June 30, 1941, a deduction of $9,959.73 is claimed for commissions paid, of which amount $5,162.65 is claimed in the petition to have been paid to Doerr and $1,256.52 to McNell. The remaining portion of the $9,959.73 is not here in controversy. On Schedule K of its return for the fiscal year ending June 30, 1942, petitioner claimed $9,038.07 as a deduction for commissions paid, of which amount $6,353.14 is alleged in the petition to have been paid to McNell. The remaining portion of the $9,038.07 is not here in controversy. In its return for the fiscal year ending June 30, 1942, petitioner claimed a net operating loss deduction of $2,714.85, carried over from 1940 and 1941. Respondent disallowed the deductions claimed by petitioner *232 as commissions paid to Doerr and McNell for the taxable years here involved on the grounds that the evidence submitted did not prove that the payments were made for actual services rendered and that such payments were excessive in amount. The disallowance of the net operating loss of $2,714.85 claimed for the fiscal year ending June 30, 1942, follows necessarily from respondent's disallowance of the commissions above mentioned. For the taxable years ending June 30, 1940 and 1941, the amount of $3,900, or Doerr's fixed annual salary for those years, constituted reasonable compensation for the service he actually rendered to petitioner. For the taxable years ending June 30, 1941 and 1942, the commissions in the amounts of $1,256.52 and $6,353.14, respectively, paid to McNell by petitioner constituted reasonable compensation for the services he actually rendered to it. Opinion Respondent contends that the amounts sought to be deducted as commissions paid Doerr were not for services actually rendered and in any event were excessive in amount. We agree with respondent that the record here does not establish that the compensation paid Doerr in the form of commissions was reasonable within *233 the familiar provisions of section 23 (a), Internal Revenue Code. Petitioner was a closely held corporation, Doerr owning 25 shares and Helen H. Smith owning 75 shares of its outstanding stock. Doerr, Smith and Smith's wife were its directors. This is the type of situation which the courts traditionally scrutinize with care since the circumstances suggest a lack of arm's. length bargaining in determining the amount of compensation and are conducive to a distribution of profits in disguise. The necessity of such scrutiny is not allayed by the fact that such corporation paid no dividends during the period involved and reported a loss, which loss would not have been sustained had the compensation in question been reduced or eliminated. There is no showing that the increase or decrease in the volume of sales to A. S. Beck bore any necessary relationship to any increase or decrease in Doerr's efforts or activities. The following excerpt from Smith's testimony on direct examination makes this point clear: "Q. Now, in order to make this entirely clear, Mr. Doerr had nothing to do with obtaining the Beck business, did he? "A. No, sir, nothing at all. "Q. And this was merely a means of enabling *234 him to receive a larger remuneration than his regular salary during the period of the Beck business? "A. That is right. It was a vehicle, a method of determining how much it would be. Because, we felt we were making money on that business, and I didn't want to obligate myself to do something I might not be able to carry on. As long as I had the Beck business I knew I could make a profit and I was perfectly willing to share it with Ed. "Q. Did Beck represent your most substantial customer at that time? "A. During 1939 and 1940, practically 100 percent was with Beck." We therefore hold that respondent correctly disallowed the amounts claimed by petitioner as deductions on account of commissions paid to Doerr. The situation with respect to the commissions paid to McNell, however, is different. McNell was not a stockholder or officer of petitioner. The commissions paid McNell were directly related to the sales he made for petitioner. The amount of the commissions, i.e., 3 per cent, was a low one for the full fashioned hosiery business. We are satisfied that petitioner actually paid to McNell the commissions sought to be deducted and that such commissions were reasonable in amount for *235 services actually rendered. Respondent does not seriously contend otherwise. We therefore hold that petitioner is entitled to deduct the amounts claimed as commissions paid to McNell. JONES COUNTY HOSIERY MILLS, INC., Docket No. 5838 Respondent determined deficiencies in petitioner's income tax and declared value excess profits tax for the taxable years ending September 30, 1940 to 1942, inclusive, as follows: 1940
1941
1942
Income tax
$1,529.38
$1,471.95
$1,330.44
Declared value Ex-
cess Profits Tax
806.69
1,432.67 Respondent imposed a penalty of $76.47 against petitioner with respect to its income tax return for 1940 and a further penalty of $40.34 with respect to its declared value excess profits tax return for the same year. These penalties were imposed for failure to file such returns within the time prescribed by statute. Petitioner has conceded the disallowance of a claimed bad debt deduction. The remaining questions are (1) whether respondent properly disallowed a certain deduction claimed by petitioner as a loss on account of machinery scrapped by it during the taxable year 1941 (2) whether respondent properly disallowed certain deductions claimed by petitioner as compensation paid *236 its officers during the taxable year 1940, (3) whether respondent properly disallowed certain deductions claimed by petitioner for traveling expenses for the taxable years 1940, 1941 and 1942, and (4) whether petitioner is subject to penalties for failure to file its income and declared value excess profits tax returns for the taxable year 1940 within the time prescribed by statute. The decision of these questions will also decide the validity of an operating loss claimed by petitioner for the taxable year 1942. Petitioner filed its returns for its fiscal year 1940 with the collector of internal revenue for the first district of Pennsylvania at Philadelphia on December 31, 1940. Petitioner is on a fiscal year ending September 30. Its returns were filed on an accrual basis. Facts of General Application Petitioner was organized by Donald V. Smith and incorporated in September 1938 under the laws of Mississippi. It was engaged in the hosiery business with principal offices in Coopersburg, Pennsylvania. Edwin J. Doerr is president and Smith is treasurer of petitioner. From the time of its organization and during the taxable years petitioner had outstanding 31,000 shares of common stock *237 of which Smith's wife owned 16,000 shares, Doerr owned 5,000 shares and David Cottrell, Jr., owned 10,000 shares. Petitioner's directors were Smith, Smith's wife and Doerr. Petitioner's business activities consisted of leasing certain hosiery machinery to the Jones County Agricultural High School and Junior College located at Ellisville, Mississippi. Under an agreement entered into between petitioner and the school on October 6, 1938, petitioner agreed to lease from 25 to 36 full fashioned hosiery machines to the school for a term of 25 years for a nominal rental of $1 a year. Petitioner undertook to operate and maintain these machines and to furnish the necessary raw materials. The school agreed to furnish the building to house such machines and to furnish student labor to operate such machines. Petitioner agreed to accept all the finished goods resulting from the operation of the machines. Petitioner sold such goods to Zephyr Mills, Inc., and others. Accordingly, petitioner had no physical plant in the customary sense. Its only physical assets consisted of the machinery which it leased to the school. Issue I. - Loss of Machinery Findings of Fact Petitioner obtained the original *238 36 machines leased to the school by purchase from the trustees appointed in the bankruptcy of Vertex. Petitioner purchased from such trustees in October 1938, 14 Reading machines and 22 Wildman machines for a total of $25,000 which was paid by petitioner on October 16, 1938. It was necessary for petitioner to incur certain expenses in order to put these machines in operating condition. Petitioner paid $2,050.08 to Hosiery Patents, Inc., for certain flexible carrier tubes and carriers. These patented devices had been attached to the machines by virtue of a contract between Vertex and Hosiery Patents, Inc. When petitioner purchased these machines from Vertex it was necessary for petitioner to pay Hosiery Patents, Inc., the amount of $2,050.08 or to remove the flexible carrier tubes and carriers from the machines. Petitioner also paid $143.84 for certain electrical work and equipment in connection with the machines. The expense incurred by petitioner on account of such patents and electrical work, amounting to a total of $2,193.92, applies indiscriminately to all 36 machines. Petitioner also paid $3,080 to Wolfgang-Richter, who was the original manufacturer of the Wildman machines. This *239 amount was paid Wolfgang-Richter to put the Wildman machines in operating condition. Petitioner also paid $200.03 to the Wildman Manufacturing Co. for services and parts necessary to put the Wildman machines in operating condition. The amounts paid to Wolfgang-Richter and the Wildman Manufacturing Co. totaling $3,280.03, applied only to the Wildman machines. During the latter part of the taxable year 1941 petitioner sold the 22 Wildman machines as scrap to a junk man from Birmingham, Alabama, for $1,507.66. The purpose of scrapping such machines was to make room in the building furnished by the school for more modern machines which had been rented by petitioner from others and which petitioner in turn also subleased to the school pursuant to its agreement. As a result of having scrapped the Wildman machines petitioner claimed a loss of $9,896.35 on its return for the taxable year 1941. In computing the amount of its loss petitioner assumed that the Reading machines were worth twice as much as the Wildman machines. Accordingly, petitioner considered that the cost of the Wildman machines represented 44 per cent of the total cost of all 36 machines purchased from the trustees in bankruptcy *240 of Vertex. In computing the cost of the Wildman machines, petitioner therefore allocated to such machines 44 per cent of the original purchase price and 44 per cent of the expenses on account of patents and electrical work. Petitioner added to the cost of the Wildman machines the full amounts paid to Wolfgang-Richter and the Wildman Manufacturing Co. From this total cost petitioner deducted an amount representing depreciation at the rate of 12 1/2 per cent for 2 years and the scrap value. By this formula petitioner arrived at its claimed loss of $9,896.35. However, the use of this formula making certain mathematical corrections in petitioner's computation results in a figure of $9,937.35. Respondent disallowed this claimed loss stating in the explanation accompanying the notice of deficiency: "(c) The deduction claimed for a loss from sale of machinery has been disallowed. The evidence submitted does not prove the amount of deductible loss sustained in the transaction." Opinion Respondent contends that the amount of the loss claimed by petitioner on account of scrapping the Wildman machines is not substantiated by the evidence. On brief respondent contends that all or most of the *241 cost of the Reading and Wildman machines is allocable to the Reading machines. In other words, respondent primarily contests petitioner's allocation of cost as between the Reading and Wildman machines on a 56-44 basis. We are satisfied that petitioner actually paid $25,000 in 1938 for the 36 machines purchased from the trustees of Vertex. We are also satisfied that petitioner sold the Wildman machines as scrap during 1941 for $1,507.66. We agree in part with respondent that the basis of petitioner's allocation, i.e., that the Reading machines were worth twice as much as the Wildman machines, is not as fully substantiated by the evidence as would seem desirable, but we do not think that the rather insubstantial character of the evidence on this point would justify us in allowing no deduction whatsoever. As the Circuit Court of Appeals for the Second Circuit recently said in Commissioner v. M. D. Maresi, Executors [156 Fed. (2d) 929] (Decided July 8, 1946): "* * * The one sure way to do injustice in such cases is to allow nothing whatever upon the excuse that we cannot tell how much to allow. * * *" We think therefore it would be unreasonable to ignore altogether such evidence. Donald *242 V. Smith made the estimate that one Reading machine was worth twice as much as one Wildman machine. His experience and background was such as to enable him to express an intelligent opinion on this subject but since the considerations underlying his estimate were not disclosed or explained and no other evidence such as the testimony of disinterested appraisers was introduced, we consider it not unfair to bear heavily on the taxpayer whose inexactitude is of its own making. Cohan v. Commissioner, supra. We have therefore decided that two-thirds of the amount claimed as corrected for mathematical error represents a reasonable allowance. We hold accordingly that petitioner is entitled to deduct two-thirds of $9,937.35, or $6,624.90, on account of the scrapped machinery as a loss for the taxable year 1941 under section 23 (f), Internal Revenue Code. Issue II - Compensation Findings of Fact Petitioner's directors held a meeting on September 9, 1940, the pertinent minutes of which are as follows: "2. The Treasurer then reported the financial standing of the company and the figures he presented demonstrated, to the Directors' satisfaction that some remuneration should be given the active *243 heads of the business, and the following resolution was duly made and seconded and unanimously carried that in view of the present position of the company and in further consideration that Edwin J. Doerr as President and Donald V. Smith as Treasurer have never received any remuneration for services rendered as active heads of the company, that they are hereby voted the remuneration; Donald V. Smith $6,000.00 and Edwin J. Doerr $4,000.00; it being distinctly understood that this is not a set wage or salary but an expression of the Company's appreciation of services rendered." Smith was in general managerial control of petitioner and was assisted by Doerr. Neither Smith nor Doerr devoted full time to petitioner's business. Smith negotiated the original agreement with the school. After the agreement had been executed between petitioner and the school, the duties of Smith and Doerr consisted of maintaining cordial relations with the school officials and seeing to it that the arrangement with the school operated efficiently. There was no salary agreement between petitioner and its officers. The financial results of petitioner's operations for the taxable years ending September 30. 1939 *244 to 1942, inclusive, as shown on its returns were as follows: Gross Profit
Net Income
Year
Gross Sales
from Sales
Losses
Deductions
Salaries
or (Loss)
1939
$ 72,746.80
$ 6,377.85
$ 8,914.89
($2,537.04)
1940
162,211.15
20,208.79
19,968.68
$10,000 *
240.11
1941
166,797.31
16,094.87
$9,896.35
12,630.78
( 6,432,26)
1942
152,206.18
8,764.80
8,794.58
( 29.78)
Respondent disallowed the claimed compensation payments explaining in his statement accompanying the deficiency notice: "(a) The deduction claimed for compensation paid to officers has been disallowed, because the evidence submitted does not prove that the amounts paid were for services rendered, and because the amounts are excessive for the services rendered." Opinion Respondent contends that the amounts claimed by petitioner as deductions for compensation paid to Smith and Doerr are not allowable because petitioner has failed to prove that such amounts were in fact paid for services rendered. Respondent further argues that in any event such amounts are excessive. We agree with respondent that petitioner has failed to establish that the amounts involved were paid to Smith and Doerr as compensation for services *245 rendered. As we said in Twin City Tile & Marble Co., 6 B.T.A. 1238, and which was quoted by the Circuit Court in Twin City Tile & Marble Co. v. Commissioner, 32 Fed. (2d) 229: "The first question to determine is whether the amounts which were disallowed by the respondent as compensation to officers and stockholding employees were paid by the corporation as compensation for services rendered. If the amounts were in fact distributions of profits as determined by the respondent, they would not be allowed as deductions in determining the petitioner's net income. It may be that if the amounts had been paid as compensation, they would have been allowed as being reasonable. In determining whether the amounts were compensation for services or were distributions of profits, all the facts and circumstances must be considered and not merely the fact that the amounts were reasonable. "* * * Conceding for the sake of argument that the services of individuals in this case were fairly worth the amounts they received, this fact alone is not sufficient to constitute the amounts compensation. They must have been intended and paid as such." See also Botany Worsted Mills v. United States, supra; and *246 Bridges-Smith Co. v. Glenn, (D.C.S.D. Ky.) March 18, 1939, affirmed 116 Fed. (2d) 934. After carefully considering the evidence submitted by petitioner in this case we are of the opinion that petitioner has failed to establish that the payments in question were in fact compensation for services rendered by Smith and Doerr. The language of the resolution authorizing the payments in question, which we have quoted in full in the findings of fact, supports our view. The resolution states that the treasurer explained the financial standing of petitioner and that the figures he presented demonstrated that remuneration should be given to the active heads of the business. The resolution stated that it was distinctly understood that these amounts were not to be considered as a set wage or salary but was merely an expression of the company's appreciation for services rendered. This language strongly suggests to us that the directors in authorizing the payments in question were more concerned with the financial condition of the company than they were with expressing their appreciation to its officers for services rendered. Nor is the impression created by the language of the resolution in any *247 way lessened by the fact that two of the three directors authorizing the payments were also the officers to whom they were expressing their appreciation. The dual capacities of Smith and Doerr and their relationship to petitioner are not such as to establish an atmosphere which assures us that the amounts paid were compensation. Furthermore, it is not without significance that petitioner's finances were such that had the alleged compensation not been paid there would have been profits. In this connection it is noteworthy that the resolution authorizing the payments was made at the end of petitioner's fiscal year at which time the profits for the year could be ascertained with reasonable certainty. All these circumstances have persuaded us that the payments in question were a distribution of profits and not compensation for services rendered. We accordingly hold that respondent correctly disallowed such amounts as deductions. Issue III - Traveling Expenses Findings of Fact Petitioner's directors held a meeting on June 19, 1939, the pertinent minutes of which are as follows: "The treasurer then brought up the matter of his personal traveling expenses and other expenses incurred in the *248 business of the Jones County Hosiery Mills, Inc., and on full discussion motion was duly made and seconded and unanimously carried. It was authorized that he be granted $250 remuneration of said expenses per month." It was necessary for Smith or Doerr or both to visit Ellisville, Mississippi, from Coopersburg, Pennsylvania, in connection with petitioner's business at least once a month. When Smith made such trips he usually stayed in Ellisville for a week or ten days. Such travel was accomplished variously by plane, train or automobile. If the trips were made by automobile business other than petitioner's was attended to on the way. The expense of such travel included transportation, meals and lodging. Such expenses also included the entertainment of school officials and other persons connected with petitioner's business. In one instance Smith spent money for Venetian blinds for the Rotary Club at Ellisville. No itemized record of such expenses was ever kept. The amount of $250 a month which petitioner agreed to pay Smith was intended to cover the traveling expenses of Smith and Doerr. On account of the amounts so paid to Smith petitioner claimed as a deduction on its returns for *249 the taxable years 1940 and 1941 the amount of $3,000 in each year. In its return for the taxable year 1942 petitioner claimed as a deduction on account of traveling expenses $1,111.94. The reduced amount claimed by petitioner for 1942 was due to the fact that the Ellisville Hosiery Mills, Inc., shared the traveling expenses of Smith and Doerr with petitioner. Respondent disallowed these claimed deductions stating in the explanation accompanying the notice of deficiency: "(b) The deduction claimed for travel expenses has been disallowed, because the evidence submitted does not prove that they were ordinary and necessary expenses of the business." Opinion With respect to the amounts paid by petitioner to Smith to cover his and Doerr's traveling and other expenses, respondent contends that petitioner has failed to prove the nature and character of the expenses incurred by Smith and Doerr. It is true that the evidence does not establish with any degree of definiteness or detail the actual items of expenses incurred by Smith or Doerr. No itemized record of such expenses was kept. However, we are not too concerned by the absence of itemization. The arrangement was one whereunder petitioner *250 paid Smith a fixed amount which was intended to fully reimburse both Smith and Doerr for any travel expenses incurred by them in connection with petitioner's business. Amounts paid under such fixed arrangements have been allowed as deductions when the courts have been satisfied that the fixed amount bears a reasonable relationship to the expenses actually incurred by the recipient officers and this even where no itemized records have been kept. As we said in Hess Brothers, 7 B.T.A. 729, at 732: "The fact that the president and vice president were not required to keep itemized expense accounts is not material, as the evidence shows that the sums were authorized by the petitioner; were expended by the officers in the carrying on of the business and were, in fact, less than the amounts actually expended by said ofcers. Julius Forstmann, 6 B.T.A. 21." See also Eitingon-Schild Co. and Subsidiaries, 21 B.T.A. 1163. However, in the instant case we are not satisfied that the fixed amount paid by petitioner to Smith was reasonably equivalent to the expenses incurred by Smith in connection with petitioner's business. The evidence suggests that some of the expenses incurred by Smith, which *251 were intended to be covered by the fixed allowance, were such as might not properly be considered business expenses. We are satisfied, however, that Smith and Doerr did incur certain traveling and other expenses in connection with petitioner's business and that these expenses were considered by the parties concerned as reimbursed by the fixed payments. We therefore think that some deduction should be allowed. We again must bear heavily on the taxpayer whose inexactitude is of its own making. Cohan v. Commissioner, supra. We therefore hold that petitioner is entitled to deduct one-half of the amounts claimed under this issue. Issue IV. - Penalties Respondent imposed penalties with respect to petitioner's income tax and declared value excess profits tax liability for the taxable year 1940 for failure to file such returns within the time prescribed by statute. The returns in question were for the fiscal year ending September 30, 1940. They should have been filed therefore on or before December 15, 1940. Actually they were filed on December 31, 1940. Petitioner assigned the imposition of such penalties as error in its amended petition but failed to introduce any evidence on this point *252 or discuss it on brief. We hold therefore that penalties at the rate imposed by respondent are applicable but that the amount of such penalties must depend on the amounts of the deficiencies as determined under Rule 50 computation pursuant to our decision of the issues here involved. ELLISVILLE HOSIERY MILLS, INC., Docket No. 5839 Respondent determined deficiencies in petioner's income tax, declared value excess profits tax and excess profits tax liabilities for the taxable year ended May 31, 1942, in the respective amounts of $3,349.79, $1,354.36 and $3,361.49. Respondent also assessed a penalty against petitioner in the amount of $840.37 for failure to file an excess profits tax return. The questions involved are as follows: (a) whether amounts sought to de deducted by petitioner as compensation to its officers are excessive in amount, (b) whether deductions claimed by petitioner as depreciation on its machines are excessive, (c) whether amounts paid by petitioner as legal fees constituted ordinary and necessary business expense, and (d) whether petitioner is subject to penalty for failure to file an excess profits tax return. Petitioner filed its returns with the collector of internal *253 revenue for the district of Mississippi at Jackson. Petitioner's return is on an accrual basis and for a fiscal year ending May 31. Issue I - Compensation Findings of Fact Petitioner was incorporated in May 1940 under the laws of Mississippi to engage in the business of manufacturing hosiery. Its physical manufacturing plant is located at Ellisville, Mississippi, but its records are kept in Coopersburg, Pennsylvania. Donald V. Smith is petitioner's treasurer and a director. Edwin J. Doerr is petitioner's secretary and also a director. Frederick R. Mazzitelli is vicepresident. The record does not indicate who petitioner's president was or who was its other director or directors. Smith and Doerr acting as a quorum of the directors held a meeting on January 12, 1942. At this meeting a resolution was passed as follows: "Motion was made and seconded that the salaries of the officers commence on September 1, 1941, at the annual rate of: W. W. Greager
$ 5,000.00
F. R. Mazzitelli, Vice-Pres.
4,000.00
E. J. Doerr, Secretary
4,000.00
D. V. Smith, Treasurer
12,000.00" It was also provided that these salaries would be paid on a weekly, monthly or annual basis depending on petitioner's financial condition *254 and at the discretion of its treasurer, Smith. During the taxable year petitioner paid to Smith and Doerr by check from time to time on account of their salaries the respective amounts of $2,080 and $1,050. On May 29, 1942, petitioner paid to Smith, Doerr and Mazzitelli from an account entitled "Payroll Account" the respective amounts of $6,900, $350 and $1,500. On May 30, 1942. petitioner accrued on its books as salaries to Doerr and Mazzitelli the respective amounts of $1,600 and $1,500. On May 29, 1942, when the above mentioned amounts were paid from payroll account petitioner also paid from such account $180 each to Greager, Mertz and Straussberger, who each owned six shares of petitioner's stock. At the same time and from the same account petitioner paid $135 to Balliet, who owned 4 1/2 shares. Smith's wife and children owned 205 shares of petitioner's stock. Doerr owned 64 shares and Mazzitelli owned 96 shares. Smith's and Doerr's relationship to petitioner with respect to the character of the services they rendered was similar to their relationship to the Zephyr and Jones County companies. Smith, as a practical matter, was chief executive and in managerial control. Doerr acted *255 as Smith's assistant. Mazzitelli, prior to June 1941, had been employed as hosiery buyer for A. S. Beck & Co., a large retail shoe and hosiery company. Smith had known him for 13 or 14 years. It was through Mazzitelli that Smith had obtained the A. S. Beck business for Zephyr. In June 1941 Mazzitelli left Beck's employ and thereafter during the taxable year was in the business of hosiery jobbing in New York. Mazzitelli was relied on by Smith for advice and information concerning raw material sources, price trends, market conditions, government regulations, and other miscellaneous matters concerning style and color in connection with the hosiery business. The services furnished by Mazzitelli were not in connection with petitioner's business. During the taxable year petitioner's business was that of commission knitter. Its customers ordered stockings according to specifications provided by them. Such customers also provided petitioner with the necessary raw materials. Petitioner, following the specifications given and using the raw material furnished, manufactured stockings "in the greige", i.e., undyed and unfinished. The financial results of petitioner's operations during the taxable *256 year according to its return were as follows: Net
Gross Sales
Net Sales
Deductions
Income
$100,826.31
$40,924.85
$37,589.47
$3,335.38 $ Included in the amount headed "Deductions" is the amount of $15,000 representing compensation to petitioner's officers. Petitioner breaks down this figure as follows: D. V. Smith
$9,000
E. J. Doerr
3,000
F. R. Mazzitelli
3,000
Of the above amounts claimed by petitioner as deductions for compensation paid its officers respondent disallowed as a deduction $7,000 on account of Smith's salary, $2,000 on account of Doerr's salary and $3,000 on account of Mazzitelli's salary. In other words, respondent allowed as a deduction $2,000 for Smith's salary, $1,000 for Doerr's salary and nothing for Mazzitelli. In the statement accompanying the notice of deficiency respondent explained the disallowance as follows: "(a) The following portions of compensation paid to officers have been disallowed as deductions, because the evidence indicates that the amounts are excessive for the services rendered: F. R. Mazzitelli
$ 3,000.00
E. J. Doerr
2,000.00
D. V. Smith
7,000.00
Total disallowance
$12,000.00"
Reasonable compensation for the services rendered by Smith and Doerr to petitioner during *257 the taxable year is, respectively, $2,000 and $1,000. Mazzitelli performed no services of value to petitioner during the taxable year. Opinion Respondent contends that to the extent the alleged compensation was disallowed by him it was excessive in amount. Respondent argues that petitioner has failed to prove that the compensation in question is reasonable in amount. Respondent further urges that such amounts constituted a distribution of profits. We agree with respondent. The evidence furnished by petitioner furnishes us with but vague and general information concerning the nature and extent of the services rendered by Smith and Doerr to petitioner. Both men devoted only part time to petitioner's business. On this state of the record we think our finding that reasonable compensation to Smith and Doerr was $2,000 and $1,000, respectively, is warranted. Mazzitelli was engaged in business for himself in New York during the taxable year. It is impossible therefore that he could have spent much time on petitioner's business. He furnished Smith with information and advice concerning raw material sources, price trends, market conditions, government regulations and style and color of hosiery. *258 It is difficult for us to perceive how advice on these subjects could have been of any value to petitioner which, during the taxable year, was engaged as a commission knitter. Petitioner's customers furnished the raw materials and the style specifications for the hosiery which petitioner made for them. Such hosiery was unfinished and undyed. Under these circumstances advice concerning raw material sources, market conditions and style and color would seem unrelated to petitioner's business. We have so found as a fact. The advice furnished by Mazzitelli may have had value and relevance with respect to other companies in which Smith was interested but this does not have any bearing in the instant case. It is highly significant that the amounts allegedly paid as compensation from the payroll account and the amounts accrued as compensation were determined, respectively, on May 29 and 30 of petitioner's fiscal year which ended May 31, 1942. The amounts of compensation determined on May 29 and 30 bear a strikingly significant relationship to stockholdings. On May 29 Smith was paid $6,900 from the payroll account. His family owned 205 shares of petitioner's stock. This would represent a distribution *259 of approximately $33 a share. Doerr received a payment of $350 on May 29 from the payroll account and $1,600 accrued on petitioner's books to his credit the next day, making a total compensation determined in Doerr's favor for these two days of $1,950. This amount represents approximately $30 on each of his 64 shares. Mazzitelli received $1,500 on May 29 and was credited with $1,500 the next day, making the total of $3,000, or approximately $31 on each of his $ 96 shares. On May 29, Greager, Mertz and Straussberger each were paid $180 from the payroll account. Each of these men owned 6 shares, thus the amount received by them is the exact equivalent of $30 a share. Balliet received $135 from the payroll account. He owned 4 1/2 shares. This again is the exact equivalent of $30 a share. It is difficult for us to believe that this relationship between the amounts in question and the stockholdings is a mere coincidence. The amounts allowed by respondent correspond closely to the amounts which petitioner paid to Smith and Doerr by check from time to time during the year excluding the payments or credits made on May 29 and 30. Respondent allowed nothing as compensation to Mazzitelli. Under *260 the circumstances discussed above we hold that respondent's determination is correct. Issue II - Depreciation Findings of Fact During 1940 and 1941 petitioner purchased four new 30-section 51 gauge ladies' full fashioned knitting machines from Textile Machine Works of Wyomissing, Pennsylvania. The total cost of these four machines was $76,274.14, including freight and installation costs. Each of these machines was equipped with a welt turner, a device which has to do with the reenforcing of the top of hose. Each welt turner cost approximately $2,250, which amount is included in the total cost of the machines given above. In 1942 welt turners were relatively new devices and apparently were not operating to the complete satisfaction of the hosiery industry. Petitioner had difficulties in making its welt turners operate properly. Their improper $ operation had resulted in a good many "menders" or defective hose. During the taxable year petitioner anticipated increasing difficulties with these devices. Subsequent experience, however, proved less unfavorable than had been anticipated. Each of the four knitting machines was also equipped with a lace tackle, a device which enables the manufacture *261 of fancy hose. Each of these devices cost $1,250 which is included in the cost of the machines given above. Before petitioner had been able to get the knitting machines operating smoothly enough to permit the use of the lace tackle devices the Federal government, as a wartime measure, prohibited their use. Since the cessation of hostilities the government has removed this restriction. Petitioner, however, considers that it is not now feasible to use these late tackles since these devices have not been broken in with the knitting machines. Accordingly, the lace tackle devices have never been used by the petitioner. During the taxable year petitioner operated the knitting machines 24 hours a day, 6 days a week or 144 hours a week. The average knitting mill operated 40 hours a week. Some mills operated 80 hours a week and a few 120 hours a week. Some of petitioner's labor was inexperienced having been recruited from the rural area surrounding Ellisville, Mississippi. Petitioner had imported some skilled labor from the North and had an experienced superintendent. On its return for the taxable year 1942 petitioner claimed as a deduction for depreciation on the machines in question the amount *262 of $11,319.62. This depreciation is figured on a cost basis of $76,274.14 and an estimated life for the machines of 6 2/3 years. In determining this rate of depreciation on such machinery petitioner considered and gave effect to the following factors: (a) that the welt turners were operating in an unsatisfactory manner and that increasing difficulties with them were anticipated, (b) that the lace tackle devices were rendered inactive by virtue of Government restriction, (c) that the knitting machines were being operated 24 hours a day, 6 days a week, (d) that inexperienced labor was being used and increased the wear and tear on these machines, and (e) that the substitution of nylons for other kinds of stockings would limit the useful life of these machines. Respondent in the statement accompanying the notice of deficiency stated: "(b) Excessive deduction for depreciation on Machinery and Equipment disallowed. Deduction claimed
$11,319.62
Deduction allowed
5,659.81
Deduction disallowed
$ 5,659.81"
Opinion Respondent contends that petitioner has not adequately proved its claim for accelerated depreciation. We agree with respondent. Petitioner bases its claim for an accelerated rate of depreciation *263 in part on the fact that the welt turners were operating improperly and were expected to continue giving trouble. Smith testified that "we felt we certainly ought to charge off a good hunk of the automatic welt turners to depreciation * * * feeling that as the machine broke in further and wore in that we would have more and more trouble with this automatic welt turner." In our opinion anticipated mechanical difficulties are not factors to be properly accounted for by an accelerated rate of depreciation. The economic loss, if any, which petitioner is seeking to adjust in terms of depreciation is clearly not one arising from wear and tear or to obsolescence due to the normal progress of the art. It might be that had petitioner shown by clear and convincing evidence that the welt turners, being in the nature of an innovation in the industry, had inherent defects characteristic of many new developments, which would have been remedied by improved models, with any reasonable or foreseeable certainty the proper factor of obsolescence might have been established. But petitioner did not establish this. Petitioner also based its claim for accelerated depreciation in part on the fact that it *264 was prohibited from using the lace tackle device by virtue of Government restrictions. Petitioner claims that these devices can not now be used because they have not been broken in with the machines. Here again petitioner is attempting to adjust an economic loss in terms of depreciation or obsolescence in a manner which we think is not tenable. Such loss clearly did not result from wear or tear, nor do we think the situation is one which is properly susceptible of being recognized as a form of obsolescence. Obsolescence contemplates conditions that will result in an abandonment at a future date prior to the end of an asset's normal useful life. Regulations 111, section 29.23 (1)-6. In the instant case the Government restriction appears to have been wholly unexpected and to have affected immediately but only temporarily the asset's availability for use. There was no anticipated gradual diminution of useful value. We do not think that obsolescence applies in such situation. Nor do the facts here warrant a deduction under section 23 (f), Internal Revenue Code or under section 29.23 (e)-3 of Regulations 111 which provides in part as follows: "When, through some change in business conditions, *265 $ the usefulness in the business of some or all of the capital assets is suddenly terminated, so that the taxpayer discontinues the business or discards such assets permanently from use in such business, he may claim as a loss for the year in which he takes such action the difference between the basis * * * and the salvage value of the property. This exception to the rule requiring a sale or other disposition of property in order to establish a loss requires proof of some unforeseen cause by reason of which the property has been prematurely discarded, as, for example, * * * where new legislation directly or indirectly makes the continued profitable use of the property impossible. * * * [Emphasis supplied]." Petitioner has not claimed a loss under these provisions nor has it furnished proof that the assets in question were permanently discarded. We are convinced from a careful examination of the record that Smith, acting for petitioner, was consciously or unconsciously influenced in determining the accelerated rate of depreciation by his anticipation of an increasing use of nylon in the manufacture of hosiery. Here again if petitioner had shown with any reasonable certainty that changing *266 economic conditions within the hosiery industry would shorten the normal life of the machinery a proper element of obsolescence might have been established, but on the record before us the situation with respect to nylon is offered as an unsubstantiated guess by Smith. Such evidence, if it may be so called, is inadequate as the basis of a finding of fact. Section $ 29.23 (1)-6 of Regulations 111 provides in part that "No deduction for obsolescence will be permitted merely because, in the opinion of a taxpayer, the property may become obsolete at some later date."$ We think the fact that the machinery was operated overtime and with inexperienced labor were properly considered by petitioner in determining an accelerated rate of depreciation but the significance of these facts with respect to their effect on the life of the machinery has not been shown with any degree of clarity. It is not necessarily true that machinery will deteriorate in a direct ratio to its use. We are not told to what extent petitioner's labor force consisted of inexperienced workers. It is therefore difficult for us to evaluate these facts in terms of their effect on the life of the machinery. Bureau Bulletin "F" *267 revised January 1942 states that the composite life of rayon manufacturing machinery is approximately 16 years. Respondent's allowance for depreciation is based on an estimated life of 13 1/3 years. Respondent has $ therefore allowed in part an accelerated rate of depreciation to petitioner. The burden of proof is on petitioner to establish that an accelerated rate based on an estimated life of 6 2/3 years claimed by it is reasonable and proper. Since petitioner has, in our opinion, included improper elements of loss as depreciation or obsolescence and since the proper facts it has considered are inadequately explained we think it has failed to sustain its burden of $ proof. We therefore approve respondent's determination with respect to depreciation on machinery in question. Issue III - Legal Fees Findings of Fact Towards the end of the taxable year 1942 Joseph J. Brown, petitioner's attorney, submitted a bill for legal services rendered in $ the amount of $3,000. On May 20, 1942, this item was accrued on petitioner's books. Payments on account of such bill were made by petitioner by check during the year 1942 as follows: $1,500 on $ June 19, $750 on September 10, and $752.65 on *268 September 22. It does not appear why the total amount paid by check exceeds the bill by $2.65. The bill rendered by Brown was the first bill he had submitted petitioner since its incorporation. The services on account of which the bill was rendered included advice concerning petitioner's incorporation. Brown had advised petitioner to obtain the services of a Mississippi attorney for purposes of incorporation. Other services included advice concerning a means of distributing stock to employes and advice with respect to petitioner's purchase of the machinery discussed in connection with the depreciation issue. Brown also advised petitioner with respect to leasing a building from the Village of Ellisville, Mississippi, and concerning petitioner's contractual obligations on certain contracts which were affected by the government's restriction of silk. Brown also advised petitioner with respect to certain wage and hour questions. On its return for the taxable year 1942 petitioner claimed as a deduction for legal fees the amount of $3,025. Respondent in the explanation accompanying the notice of deficiency stated: "(c) The deduction claimed for legal expenses paid to Joseph J. Brown has *269 been disallowed. The evidence submitted does not prove that this is an ordinary and necessary expense of the business." The reasonable value of the services rendered by Brown to petitioner is $1,500. Opinion Respondent contends that petitioner has failed to prove that the amounts paid as legal fees to Brown were necessary expenses of the business. Petitioner established to our satisfaction that Brown submitted it a bill during the taxable year for $3,000 for legal services rendered by him from the time of its organization in 1940. We are further satisfied that some of the services on account of which this bill was rendered were such as constituted expenses of the business. Other services, such as those pertaining to petitioner's incorporation, would appear capital in nature. Although the evidence has satisfied us that part of the services related to petitioner's business, the petitioner has not established in sufficient detail the extent of the services so as to justify in our opinion the reasonableness of the amount claimed. Respondent urges that the services rendered by Brown were only of nominal value. After carefully considering the evidence available to us we have concluded that *270 a reasonable allowance on account of such legal fees is $1,500 and have found as a fact that this amount represents the reasonable value of Brown's services to petitioner. Respondent suggests that the amounts paid to Brown by petitioner were in fact for services which Brown rendered to Smith in connection with matters unrelated to petitioner's business. We have been unable, however, to find any justification for such an inference. We hold that petitioner is entitled to deduct as a business expense the amount of $1,500 on account of the amounts paid Brown as legal fees. Issue IV - Penalty Petitioner failed to file an excess profits tax return for the taxable year ending May 31, 1942. Respondent assessed a 25 per cent penalty against petitioner therefore by virtue of section 291 of the Internal Revenue Code. Petitioner did not file an excess profits tax return because it did not believe that it had any excess profits net income for that year. In the instant case there is no proof whatever that the good faith of the petitioner or its belief that it had no excess profits net income was based on reasonable grounds. Under these circumstances petitioner has failed to show that the failure *271 to file was due to reasonable cause within the meaning of section 291. P. Dougherty Co., 5 T.C. 791; Burford Oil Co., 4 T.C. 613, affirmed 153 Fed. (2d) 745. We hold, therefore, that if, under a computation under Rule 50 pursuant to our determination of the above issues, excess profits taxes are due from petitioner for the taxable year 1942, petitioner is liable for a 25 per cent penalty thereon. Decisions will be entered under Rule 50. Footnotes
*. This amount is included in the $19,968.68 deductions.↩